# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | | |
|---|---|---|
| BERTHA E. STEPHANS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 1:07-CV-282 PPS |
| | ) | |
| UNDERSEA SENSOR SYSTEMS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Undersea Sensor Systems, Inc. ("USSI") fired Bertha Stephans for threatening to physically harm another coworker, Stephanie Moctezuma, during an argument between the two. Stephans claims she never made any threat, and that USSI does not honestly believe that Stephans threatened Moctezuma. Instead, she alleges that USSI fired her because she is black and spared Moctezuma for the same conduct because Moctezuma is white. USSI says Stephans's termination has nothing to do with race and has moved for summary judgment. Because this case rests heavily on credibility issues for a jury to decide, USSI's motion is denied.

## I. FACTUAL BACKGROUND

Stephans, a black female, began working at USSI in assembly production sometime in late 2000. (Stephans Dep. at 20, 39.) After about a year, she moved to an area of the plant referred to as "CSO." (*Id.* at 40.) Her job entailed soldering wires onto circuit boards and then preparing the circuit boards for potting. (*Id.* at 40-41.) As Stephans explains it, the potting process involves pouring some liquid around the circuit board and then baking the circuit boards in an oven overnight until the liquid solidifies. (*Id.* at 40-42.)

On November 8, 2005, at approximately 6:00 a.m., Stephans arrived at work and discovered that unfinished parts had been taken out of the oven.  (*Id.* at 62.)  Stephans asked aloud who was responsible. (*Id.* at 63.)  One of Stephan's coworkers, Stephanie Moctezuma, a white female, came over and informed Stephans that she had taken the parts out of the oven.  (*Id.* at 64.)  Stephans then told Moctezuma that parts were not ready to be taken out. (*Id.* at 65.)  An argument ensued between them.  According to Stephans, Moctezuma "started yelling, cussing and carrying on" and this behavior came out of the blue (*Id.*)  Moctezuma denies swearing at Stephans, but admits to saying "I'm not going to put up with your shit."  (Moctezuma Aff. ¶ 9, 14.)  Evidently, Moctezuma doesn't believe that using the word "shit" amounts to swearing.  Moctezuma contends that Stephans was the aggressor.  She claims that Stephan told her "I'll kick your ass, bitch."  (Moctezuma Aff. ¶ 6.).  Stephans denies making this or any other threat.  (Stephans Dep. at 66-68.)  But Stephans admits that, during the argument, she swore and yelled at Moctezuma.  (*Id.*)

Annis Combs, Stephans's and Moctezuma's supervisor, testified that she witnessed the confrontation.  (Combs Aff. ¶¶ 4-5.)  Combs claims she heard Stephans calling Moctezuma a "fucking bitch."  (*Id.* ¶ 6.)  Stephans denies making these remarks.  (Stephans Dep. at 66-67.)  She further asserts that Combs was nowhere near where the argument occurred and that Combs is lying about witnessing the confrontation.  (*Id.* at 68.)

After the altercation, Stephans, Moctezuma and Combs met in the office of Mark Trout, USSI's Director of Operations, and waited for Trout to arrive.  (Combs Aff. ¶¶ 8-9.)  According to Combs, Stephans started yelling and called Moctezuma a "damn liar."

(*Id.* ¶ 11.) Stephens admits calling Moctezuma a "damn liar," but says that Moctezuma was the only person who was yelling during this exchange. (Stephans Decl. ¶ 6.) Combs instructed Moctezuma to return to work while Stephans waited in Trout's office. (*Id.*) Meanwhile, Combs went into another office and called Trout to apprise him of the situation. (Combs Aff. ¶ 12.) In a second call, Moctezuma told Trout her side of the story. (Trout Aff. ¶ 4.)

When Trout arrived at work, he interviewed Stephans and Moctezuma separately, as well as any potential witnesses to the incident. (*Id.* ¶ 6.) According to Trout, Stephans did not deny to him that she threatened to kick Moctezuma's ass or that she repeatedly used the "f word." (*Id.* ¶ 7.) Stephans insists that she explicitly denied to Trout that she threatened Moctezuma in any way. (Stephans Decl. ¶ 7.) When Trout interviewed Moctezuma, she repeated her story to Trout and admitted using the word "shit," but contended that Stephans started swearing first. (Moctezuma Aff. ¶ 14.) Trout also interviewed Gloria Starks, a USSI employee who worked near Stephans's station. (Trout Aff. ¶ 10.) Starks told Trout that she overheard Stephans complaining about the oven and using swear words, but she heard no threat being made. (*Id.*)

After Trout interviewed Starks, two other employees who work near Stephans's work area, Loretta Monnier and Jodie Brantley, came to Trout's office. (*Id.* ¶ 11.) Both employees expressed their views, based on this and previous incidents, that Stephans was out of control and that something had to be done about her. (*Id.*) Monnier told Trout that she heard Stephans call Moctezuma a "fucking bitch" and yelled other obscene phrases. (Monnier Aff. ¶¶ 5, 8.) Monnier also speculated based on her assessment of Stephans's posture and tone that if there had not been a table between Stephans and Moctezuma, she

3

believed Stephans would have been physically violent towards Moctezuma. (*Id.* ¶ 6.) But Monnier does not indicate that she witnessed Stephans make any threatening statements or gestures to support her speculation.

At approximately 8:00 a.m., Human Resources Manager Carol Reilly arrived to work. (Trout Aff. ¶ 12; Reilly Aff. ¶ 4.) Trout informed Reilly about the incident and relayed the results of his investigation so far. (*Id.*) Reilly and Trout interviewed two more witnesses (both whom only heard screaming and cursing but could not recall details). (Trout Aff. ¶ 13-14; Reilly Aff. ¶ 5-6.) They then discussed their findings and concluded that Stephans had made a physically threatening statement to Moctezuma. (Trout Aff. ¶ 19; Reilly Aff. ¶ 11.) This conduct, if it occurred, violates USSI's Workplace Violence Prevention Policy which appears in the company's employee handbook. (DE 21 at 30-31.) Stephans acknowledges receiving and reviewing the handbook. (*Id.* at 27-29.) The policy states that "violence is a form of serious misconduct that undermines the integrity of the employment relationship. No employee should be subject to unsolicited and physical violence threats or intimidation. Such behavior may result in disciplinary action up to and including dismissal." (*Id.* at 30.) Among the activities prohibited by the policy are "verbal and physical threats, threatening gestures, or statements." (*Id.* at 31.) Based on their belief that Stephans made threats of violence in the workplace, Reilly and Trout informed Stephans that same day that she was being fired. (Trout Aff. ¶ 19; Reilly Aff. ¶ 11.) They also determined that Moctezuma should be issued a written warning for raising her voice and using foul language. (Trout Aff. ¶¶ 18, 22.)

This lawsuit, alleging race discrimination in violation of 42 U.S.C. § 1981,

4

followed. USSI denies that it discriminated against Stephans in any way. USSI claims it fired Stephans for a race-neutral reason: for her having made threats of violence against another employee in the workplace. USSI therefore seeks summary judgment.

## II. DISCUSSION

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A genuine dispute about a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986). In making this determination, a court construes "all facts and draws all inferences in the light most favorable to the non-moving party." *McCoy v. Maytag Corp.*, 495 F.3d 515, 520 (7th Cir. 2007).

A claim alleging race discrimination under Section 1981 is evaluated in the same way as a Title VII claim. *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 404 (7th Cir. 2007). Only the indirect method of proof is at issue, and much of what Stephans must show to meet a prima facie case is not in dispute. USSI concedes that Stephans is a member of a protected class, was meeting USSI's legitimate expectations, and suffered an adverse employment action. (Def. Mot., DE 22 at 12.) What is in dispute is whether Stephans was treated less favorably than similarly situated employees that were not members of the protected class. *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 538 (7th Cir. 2007). What is also in dispute is whether the reason given by USSI for firing Stephans is a pretext for discrimination. *Id*.

Stephans points to her coworker Moctezuma, a white employee who was not fired

5

for her involvement in the confrontation, as an employee who was similarly situated to her but who was treated more favorably. In disciplinary cases – where the plaintiff claims she was disciplined more harshly than another employee for some impermissible reason – courts consider whether the two employees "dealt with the same supervisor, were subject to the same standards and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Gates v. Caterpillar*, 513 F.3d 680, 690 (7th Cir. 2008).

Stephans and Moctezuma both reported to Annis Combs and were subject to the same workplace behavior policies. But the parties disagree as to whether Stephans and Moctezuma engaged in similar conduct. Stephans and Moctezuma were involved in the same confrontation; both raised their voices and used foul language in the exchange. USSI asserts that Stephans was fired because she made threats while Moctezuma did not. But Stephan denies this and I must accept her version of the events. So Stephan and Moctezuma are similarly situated to one another because they reported to the same supervisor, they were subject to the same standards, and they engaged in similar conduct – a workplace argument where voices were raised and foul language was used. Yet Moctezuma, the white employee, was disciplined while Stephan was fired. So Stephan easily meets the prima facie case.

I move now to the central issue in the case – pretext. The precise issue is whether USSI honestly believed that Stephans threatened Moctezuma, or whether this was just a cover story to mask discriminatory motives. *See Fischer v. Avande, Inc.*, 519 F.3d 393, 403 (7th Cir. 2008). The plaintiff may prove pretext through indirect evidence that shows the employer's stated reason is not credible or that the reason is factually baseless. *See id.*

In addition, the plaintiff must provide evidence that creates at least an inference that the real reason for the firing was discriminatory. *See id.*

USSI states that Trout and Reilly made the decision to terminate Stephans based on their investigation of the November 8, 2005 incident and their conclusion that Stephans made a threat of violence in violation of company policy. But the only person who told Trout and Reilly of this threat was Moctezuma herself, and she had an axe to grind. She was involved in the confrontation, and was facing disciplinary action herself. Strikingly, on the other side of the ledger were six employees who claimed to have witnessed the incident, and *none* of these witnesses saw or heard Stephans threaten Moctezuma. At most, some of the witnesses appear to suggest that Stephans was the more aggressive and vulgar participant in the confrontation. The other witnesses appear only to recall that there was yelling and foul language coming from both sides. USSI points me to the sworn statement of Monnier, an employee who believed from her perception of Stephans's posture and tone, that Stephans would have been physically violent if there was no table to block her way. Putting aside the questionable admissibility of Monnier's speculation, there is no evidence that Monnier saw Stephans actually make a threatening gesture or statement towards Moctezuma.

So the only people who really know whether Stephans made a threat are Stephans and Moctezuma themselves, presuming even they can recall what precisely was said in the loud verbal sparring match. Each told a competing story to USSI's management, and USSI says it chose to believe Moctezuma's version. But, why? USSI relies heavily on the fact that Stephans never denied threatening Moctezuma to Trout or Reilly. But Stephans claims in her response to summary judgment that she did repeatedly deny these

7

allegations to Trout *at the time*. Obviously, one side is lying or mistaken about what was said in these conversations and, for purposes of this motion, I once again must assume Stephans's version of the facts.

USSI wants me to disregard Stephans's assertion in her summary judgment paperwork that she denied threatening Moctezuma to Trout. USSI contends that Stephans's meeting with Trout and Reilly was discussed at length during Stephans's deposition and nowhere during that questioning did Stephans testify that she denied making a threat. USSI argues that Stephans should therefore not be permitted to make this new assertion for the first time to evade summary judgment. *See Gates*, 531 F.3d at 687-88. This is unpersuasive. USSI points only to the portion of Stephans's deposition transcript where she was questioned about her final meeting with Trout and Reilly – the meeting where she was fired. (Stephans Dep. at 81-90.) There is no indication in the record that Stephans was questioned about her first meeting with Trout, where she presumably made such denials. If she was questioned about this meeting in her deposition, that portion of the deposition was not made available to the Court. In any event, when she was questioned about the latter meeting, Stephans said the following:

> STEPHANS: No, I was being terminated because they said that I said that I was going to kick her ass, but I did not never say that.
>
> QUESTION: Would you agree that you argued with Ms. Reilly and Mr. Trout?
>
> STEPHANS: Yeah, I was arguing, and *I tried to explain to them . . .*

(Stephans Dep. at 81. (emphasis added)). Giving Stephans the benefit of the doubt, as I am required to do at this stage, she appears to have testified during this line of questioning that she denied threatening Moctezuma to Trout and Reilly.

8

Ultimately, Trout and Reilly were entitled to choose which employee's version of the facts to believe. It is not my job to act as a super-personnel board and second-guess an employer's facially legitimate business decisions. *Culver v. Gorman & Co.*, 416 F.2d 540, 547 (7th Cir. 2005). But Stephans challenges the honesty of that decision based on the conflicting testimony of Stephans and Trout and the fact that none of six witnesses to the incident could corroborate that a threat was made. In employment discrimination cases, where issues of intent and credibility are the central issues, I must apply the summary judgment standard with rigor. *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1038 (7th Cir. 1993). Here, I find there is enough circumstantial evidence for a reasonable jury to infer that USSI's proffered reason for terminating Stephans was not credible. If a jury were to draw that conclusion, then it could also reasonably infer discriminatory intent from the fact that USSI fired a black employee, and let a white employee off the hook, for essentially the same conduct.

### III.  CONCLUSION

A genuine issue of fact exists whether USSI honestly believed Stephans threatened Moctezuma with physical violence. Therefore, Defendant's Motion for Summary Judgment [DE 21] is **DENIED**. Per the Court's July 31, 2008 Order [DE 20], the Final Pretrial Conference/Settlement Conference shall be held on **Monday, January 12, 2009 at 1:00 p.m. Hammond/Central time**.

**SO ORDERED**.

ENTERED: January 5, 2009

s/ Philip P. Simon  
PHILIP P. SIMON, JUDGE  
UNITED STATES DISTRICT COURT
